NOT DESIGNATED FOR PUBLICATION

No. 126,630

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT JOSEPH EVANS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Submitted without oral argument. Opinion filed July 19, 2024. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Kristi D. Allen*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: Robert Joseph Evans appeals the denial of his postsentence motion to withdraw his plea following an evidentiary hearing. On appeal, Evans asserts the district court abused its discretion in finding that he failed to establish manifest injustice, arguing that he was essentially coerced into entering guilty pleas. He asserts that because his retained counsel sent another attorney that he had never met before to his plea hearing, this caused him to believe that if he did not accept the plea agreement, he would have been forced to proceed immediately to a bench trial with substitute counsel. But

1

Evans' arguments are belied by the record on appeal, and there is substantial competent evidence to support the district court's decision. Thus, we affirm the district court's denial of Evans' motion to withdraw his plea.

FACTUAL AND PROCEDURAL HISTORY

On January 13, 2018, Evans led police on a brief car chase, beginning when officers observed him leaving a house suspected of drug activity and attempted to conduct a traffic stop. But this pursuit lasted only a short while, ending with Evans colliding with a parked car and totaling it. While officers were arresting Evans at the scene of the crash, they saw a handgun sitting in his passenger seat.

Evans was charged with fleeing and eluding, failing to signal before turning, criminal possession of a weapon by a felon, and driving without a license. Evans retained David Leon as counsel to represent him.

Two years later, Evans entered a global plea agreement that covered three separate pending criminal cases—this case, 18-CR-180 (Case I); one count of possession of methamphetamine in 19-CR-1557 (Case II); and one count of theft in 20-CR-124 (Case III). Under this agreement, Evans agreed to plead guilty to the felon-in-possession and fleeing and eluding charges in Case I and the possession of methamphetamine charge in Case II. In exchange, the State agreed to dismiss the remaining charges in this case as well as the theft charge in Case III; agreed to recommend that the sentences in Case I run concurrent with each other; and agreed to recommend the low number in the appropriate sentencing grid for each conviction. The parties also agreed to recommend that the sentence in Case II run consecutive to Case I, and that the State would recommend the statutory presumptive prison sentence while Evans was "free to argue for any legal sentence." Finally, the parties agreed that Evans be ordered to pay $3,808.63 in restitution to the owner of the totaled vehicle, and $400 in lab fees.

*Evans' plea hearing*

On February 26, 2020, the district court held a joint hearing, covering all three cases. There, Evans' retained counsel, Leon, did not appear but sent another attorney, Jon Hansen, to appear on Evans' behalf. Hansen informed the court that Evans waived his preliminary hearings and that "as previously announced to the Court[,] we're going to want to proceed with a plea."

The district court, noting Evans had already signed the plea agreement and the accompanying acknowledgements, asked Evans if he had read those documents before signing them, and Evans answered, "Yes, sir[,]" telling the court that he had gone over the plea agreement with his attorney. The court asked if Evans had any questions, and he replied, "No, sir."

Hansen then interjected, stating that "in [his] rush" to complete the accompanying acknowledgment form, he had not yet completed the list of offenses on the second page. He stated, however, that he had discussed with Evans "the grid and the possible range of sentencings on the counts that he'd be entering a plea to." Hansen then walked through the possible sentencing ranges for these three offenses on the record and the court had Evans initial next to the sentencing ranges and maximum fines for each one. The court once again asked if Evans had discussed these acknowledgments with his attorney before he signed them, and Evans replied, "Yes, sir." "[A]ny questions before we go forward?" "No, sir." The judge then asked Evans to let him know if he had any questions—"If you'll do that for me, will you do that?"—and Evans replied, "Okay. Yes, sir."

Before the State recited the plea agreement, it first fixed a typo in the document so that it reflected the correct statute number for criminal possession of a weapon— changing it from K.S.A. 21-36049(a)(2) to K.S.A. 21-6304(a)(2). As the State was doing

3

so, Hansen explained to Evans what the basis for this change was and why it was important. Evans then signed his initials next to the change.

After the State recited the plea agreement, Evans told the court that he understood the parties' agreement that he was "free to argue for any legal sentence" to mean that he had the right to request a departure. And Evans further informed the court that he understood that the sentencing judge was not required to follow the plea agreement, but that it could impose any sentence allowed by law.

The court then went over the maximum sentences for each offense for a third time and again confirmed that Evans had discussed the sentencing guidelines with Hansen. The court then asked if he had any questions, and Evans replied, "Just how do I ask for the departure thing?" The court told Evans that his attorney would have the right to file a motion for departure before sentencing and that he could then argue for this request at the sentencing hearing. The court then explicitly asked Evans if he understood that if he pleaded guilty, he could not then withdraw his plea just because the court did not follow the sentencing recommendations in the plea agreement, and Evans answered, "Yes, sir."

At that point, Evans' retained counsel, Leon, entered the courtroom. The court had a brief discussion with Leon about Evans' restitution plan and then continued the plea colloquy with Evans. The court asked Evans if he was satisfied with his representation, and he replied, "Yes, sir."

Evans then provided the court with a factual basis for each offense. As he was doing so, Leon left the room but returned shortly after. The court then accepted Evans' guilty pleas, finding that they had been knowingly and voluntarily entered.

*Evans' sentencing hearing*

The district court held Evans' sentencing hearing eight months later. There, Leon argued in support of the motion for a dispositional departure, emphasizing that most of Evans' criminal history stemmed from his mental health complications that had gone undiagnosed since childhood; that he had availed himself of community resources and was attending several programs; and that his wife, whom he had recently married, helped keep him on the right track. Evans then personally addressed the court, explaining that he felt like he was changing his life for the better. He admitted that he "messed up," but apologized for what he did, saying that he wanted to pay restitution and do community service.

The district court denied Evans' request for a dispositional departure, as well as his oral motion for a durational departure. The court then sentenced Evans to 37 months' imprisonment for the possession of methamphetamine conviction, 19 months' imprisonment for the felon-in-possession conviction, a 5-month concurrent sentence for the fleeing and eluding conviction, and ordered restitution.

Evans filed a timely appeal, and he was released in January 2021 on an appeal bond. A little over two months later, on March 12, 2021, Evans' appeal was dismissed for failure to docket in compliance with Supreme Court Rule 2.04 (2024 Kan. S. Ct. R. at 15).

Evans was out on his appeal bond for about two years before the court issued a warrant for his arrest. After he was back in custody, on March 7, 2023, Evans filed with the district court a motion to withdraw his pleas or, in the alternative, to reinstate his appeal. In this motion, he asserted that the district court could properly consider his motion to withdraw the pleas even though it was filed outside the statutory deadline because he could establish excusable neglect. Evans then argued that he should be

5

allowed to withdraw his pleas because he received deficient representation at his plea hearing and that "[b]ut for the absence of Mr. Leon and the presence of Mr. Hansen, Mr. Evans would not have chosen to accept the plea [agreement]; Mr. Evans otherwise would have gone to trial." Evans also asserted that he was coerced into pleading guilty "because of the timing of the plea hearing," which caused him to think that if he did not plead guilty, he would have been forced to proceed immediately to trial with Hansen.

*Evans' plea-withdrawal hearing*

The district court held an evidentiary hearing on Evans' plea-withdrawal motion, during which testimony was provided by Evans, Leon, and Hansen. Hansen testified that he would occasionally cover hearings for Leon on an as-needed, case-by-case basis. Hansen stated that when Leon asked him to cover Evans' plea hearing, Leon gave him "[n]ot a lot" of background information, but Leon assured him that he had already gone over the plea agreement with Evans and that Evans accepted the deal. Hansen said he understood this hearing to be "real simple" because Evans "was ready to plead," and even if the plea agreement "blew up," there would be "no skin off [his] nose" since Evans was not his client.

Hansen testified that although he was assured by Leon that Evans "was on board" with the plea agreement, Hansen still made sure to confirm with Evans that he was "ready to go" and then spent about 10 minutes going over the plea agreement with him before the hearing. Hansen also testified that he never discussed a continuance with Evans because he was sure Evans wanted to enter into this plea agreement. He explained that he would typically request a continuance when he could tell that a client was uncomfortable accepting a plea deal—because "it's easier just to say, hey, we better put this off to another day and make sure they're on board." But again, Hansen said, his "entire impression" of the hearing was that Evans was doing what he wanted to do.

Leon testified that he had represented Evans in "multiple courts in multiple jurisdictions" and that, in this case, he had worked hard to reach a plea agreement with the State. Leon said that he went through the plea agreement with Evans "verbally and orally together" on two separate occasions—he could not remember if the first time was at the Sedgwick County Jail, but he was sure that Evans had come by his office the second time. These meetings lasted "about 45 minutes to an hour," with Leon going over the plea agreement and answering any questions Evans had. Leon explained to Evans that he had negotiated with the State for a long time and that he believed this deal was likely "the best we're going to be able to do." Leon testified that Evans agreed to take the deal, and he said that there was nothing that made him think that Evans was unable to understand the plea agreement or unwilling to accept it.

Leon added that if Evans would have decided to reject this deal, Leon would have been comfortable proceeding to a bench trial because he "knew the case inside and out." But, he explained, because Evans decided to accept the deal, he felt comfortable asking Hansen to cover the hearing when he realized that he would be unable to make it. Leon testified that Evans had previously consented to another attorney appearing on his behalf if Leon had a conflict and that Evans "had no problem" with this practice.

Evans testified next, stating that he does not remember ever being told by Leon that another attorney might handle aspects of his case. So, Evans said, because Leon failed to appear and sent Hansen instead, Evans believed that if he did not take the plea deal, he would have been forced to immediately proceed to a bench trial with Hansen. Evans testified that he did not trust Hansen because they had never met before and because Hansen "acted like he was confused" and would just reply "I don't know" to any questions Evans asked him. Evans testified that Hansen gave him the impression that he would be unable to receive a continuance and told him, "We're going to trial right now unless you take this plea." Evans stated that if he would have known he could have

continued the plea hearing, he would have done so. Accordingly, Evans explained, he only pleaded guilty because "didn't know what to do."

Evans also testified that, during the plea hearing, he was confused, flustered, and "crying the whole time." He was confused because, in past cases, he had always been offered several different pleas to choose from, while this case was either "take it or leave it." When he was asked whether he wanted to take his case to trial rather than pleading guilty, Evans answered, "Yeah. Well, kind of, yeah. I wanted a better plea. I didn't think I deserved that much time."

Evans then testified that Leon only met with him for about five minutes before the plea hearing and did not have a printed copy of the plea agreement, which made Evans believe that this was not the actual plea deal. He said that when he discovered that what Leon was referring to was "the final plea [agreement]," he was very upset and did not want to enter into that agreement. Evans explained that he did not have a chance to tell Leon about his unhappiness with the plea deal because Leon did not appear at the plea hearing, and even when he did arrive, Evans did not have time to talk to him because he "was crying the whole time."

Evans testified that he asked Leon to withdraw the pleas before he was sentenced and that he refused to do so. For his part, Leon testified that Evans never asked him to withdraw the pleas. Evans acknowledged that he never sought other counsel to help him withdraw his pleas—including the two years he was out on his appeal bond—because he said he did not know he could do that.

After hearing this testimony, the district court denied Evans' motion to withdraw his pleas, finding Evans failed to establish manifest injustice. Its decision was based on its finding that Evans' attorneys were more credible than Evans. The court then appointed

counsel so that Evans could petition this court to reinstate the appeal that was dismissed for failure to docket in March 2021.

Evans appealed the district court's denial of his postsentence motion to withdraw his plea, and the same day, the district court reinstated his March 2021 appeal.

ANALYSIS

On appeal, Evans argues the district court erred by denying his postsentence motion to withdraw his pleas because he established manifest injustice under K.S.A. 22-3210(d)(2).

The only dispute addressed by the parties on appeal is whether Evans established manifest injustice so that the district court could set aside the judgment of conviction and permit him to withdraw his pleas. Appellate courts review a district court's denial of a postsentence motion to withdraw a plea for abuse of discretion, meaning the district court's decision will generally stand unless it is based on an error of law or fact, or no reasonable person would agree with the decision. *State v. Ellington*, 314 Kan. 260, 261-62, 496 P.3d 536 (2021). This also means that appellate courts will not reweigh evidence or reassess witness credibility. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023).

A defendant is only permitted to withdraw a plea after sentencing "[t]o correct manifest injustice." K.S.A. 22-3210(d)(2). Manifest injustice generally means that it would be "'obviously unfair or shocking to the conscience'" not to allow the defendant to withdraw his plea. *State v. Shields*, 315 Kan. 131, 140, 504 P.3d 1061 (2022). To make this determination, courts typically evaluate several facts—known as the *Edgar* factors: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; (3) and whether the plea was fairly and understandingly made. *State v. Johnson*, 307 Kan. 436,

9

443, 410 P.3d 913 (2018) (citing *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 [2006]). These three factors, however, are not exhaustive and are used mainly as a guide, meaning courts may consider any other relevant factor when determining whether the defendant established manifest injustice. 307 Kan. at 443.

*There is substantial competent evidence that Evans received objectively reasonable counsel at his plea hearing.*

Evans first asserts that he received deficient representation at his plea hearing, and, because of this, he was essentially coerced into entering into a plea agreement that he did not fully understand. When a postsentence motion to withdraw a plea alleges ineffective assistance of counsel, the defendant must meet the constitutional test for ineffective assistance established by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Bilbrey*, 317 Kan. at 64. This two-prong analysis considers (1) whether the attorney's performance fell below an objective standard of reasonableness and (2) whether there is a reasonable probability that, but for the attorney's errors, the result of the proceeding would have been different. *Johnson*, 307 Kan. at 447. That is, the defendant must show that, but for counsel's deficient performance, he would have insisted on going to trial rather than entering the plea. *State Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

Evans first argues that Leon provided deficient representation by (1) failing to appear at Evans' plea hearing; (2) failing to ask Evans if he consented to substitute counsel appearing on his behalf; (3) and failing to properly prepare substitute counsel for the plea hearing.

Evans' arguments, however, are unpersuasive. First, although he asserts that Leon was deficient because he sent Hansen to cover the hearing when he could not make it himself, Evans fails to support this point with any pertinent legal authority. *State v.*

10

*Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) ("Failure to support a point with pertinent authority . . . is akin to failing to brief the issue."). Sending substitute counsel, by itself, does not mean Leon's representation was deficient and he cites nothing to support such a claim.

Second, Leon's testimony that Evans had consented several times to having another attorney appear on his behalf conflicted with Evans' assertion that he had never consented to this practice. The district court was therefore required to resolve this conflicting evidence, and it did so in favor of Leon.

And third, Leon testified that when Hansen stopped by his office on the morning of the plea hearing, Leon "went through" Evans' file and "explained everything" to Hansen; told him that Evans had accepted the plea and was ready to move forward with sentencing; and likely gave Evans' entire file to Hansen to take to the hearing. Leon also testified that he told Hansen that "if there's any issues, just set it over" by requesting a continuance.

Finally, Leon testified that he had gone over a printed copy of the plea agreement with Evans on two occasions for "about 45 minutes to an hour," explaining the sentencing guidelines, how and when to request a dispositional departure, and answering any questions that Evans had. Notwithstanding Evans' assertions otherwise, there is substantial competent evidence that Leon provided competent representation in connection with the plea hearing.

Evans next argues that Hansen provided deficient representation because he "did not know anything at all about [Evans'] cases" and only spent ten minutes going over the plea agreement with Evans before the hearing. Evans emphasizes Hansen's statement at the evidentiary hearing—that he did not consider Evans to be his client so that if this plea

11

deal "'blew up,'" it was "'no skin off [his] nose'"—and Evans argues that this showcases Hansen's lackluster performance.

But Evans' assertion that Hansen's representation fell below an objectively reasonable standard is not supported by the record. The mere fact that Hansen spent only 10 minutes going over the plea agreement with Evans before the hearing does not necessarily constitute deficient performance, especially considering that this would have been the third time Evans had reviewed the plea deal. In contrast, there is substantial competent evidence that Hansen was adequately prepared for the limited role he was expected to play and provided competent representation at the plea hearing. In fact, rather than being uninterested or unprepared, Evans himself concedes that Hansen "[paid] particular attention to the [acknowledgment] form because he discovered that [Evans] was taking numerous medications for mental health issues." In addition, Hansen testified that he understood the essence of the case, and it was likely that he had Evans' entire file with him. Indeed, Hansen made several clarifying remarks to the court throughout the hearing and answered multiple questions posed by Evans—for example, explaining to Evans why the State was correcting a typo in the plea agreement. Thus, Evans' complaints about Hansen's performance at the plea hearing are not supported by the record.

And while Hansen's remarks during the evidentiary hearing were indeed quite flippant—it being "no skin off [his] nose" if Evans' plea deal "blew up"—flippancy alone does not constitute deficiency. Rather, as discussed, there is substantial competent evidence that Hansen rendered objectively reasonable representation at the plea hearing.

Moreover, there is substantial competent evidence that Evans was not prejudiced here—that Evans would have still entered into this plea agreement notwithstanding his attorneys' actions. Evans asserts that he only entered into this plea agreement because Leon failed to show up and because he thought that if he did not enter into this

agreement, he would have been forced to proceed immediately to a bench trial with Hansen who "did not know anything at all" about his case.

But again, this argument is belied by the record. Leon testified that Evans told him that he had decided to accept the plea agreement before the day of the hearing. Further, Leon arrived a little over halfway through the hearing, which meant that Evans could have decided against entering guilty pleas and instead proceeded to a bench trial with Leon if that was indeed what he wanted. Additionally, as the State correctly notes, there is evidence that Evans did not intend to go to trial but simply wanted a better plea deal. When asked at the evidentiary hearing whether he wanted to take his case to trial rather than accepting the plea agreement, Evans answered, "Yeah. Well, kind of, yeah[,]" but then admitted that he simply "wanted a better plea" because he did not think he "deserved that much time." Thus, there is substantial competent evidence that Evans would have accepted this plea deal notwithstanding his complaints about his attorneys' actions.

*There is substantial competent evidence that Evans was not coerced into accepting the plea agreement.*

Evans next argues—a part of his manifest injustice claim—that he was coerced into accepting this plea agreement, emphasizing two points: (1) the plea process in criminal prosecutions is inherently coercive and (2) Evans was under the mistaken impression that he either accept the plea agreement or proceed immediately to a bench trial with Hansen.

But neither argument gains much traction. First, Evans does not provide pertinent legal authority to support his general assertion that the plea process is "inherently coercive." *Meggerson*, 312 Kan. at 246 ("Failure to support a point with pertinent authority . . . is akin to failing to brief the issue."). Although he cites *Missouri v. Frye*, 566 U.S. 134, 144, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012), explaining the

13

pervasiveness of plea agreements in criminal cases, the opinion goes on to say, "To note the prevalence of plea bargaining is not to criticize it."

And second, as discussed, Leon arrived at the plea hearing a little over halfway through, meaning that if Evans wanted to have proceeded to a bench trial, he could have done so—with the attorney he wanted.

Third, both attorneys testified at the evidentiary hearing that Evans told them that he accepted the plea agreement, and there is evidence that both attorneys would have requested a continuance if they believed Evans was uncomfortable accepting this plea agreement.

Finally, Evans was explicitly asked by the district court at the plea hearing whether he was coerced into entering this agreement, and Evans replied, "No, sir." And when asked whether he was satisfied with counsels' representation, he answered, "Yes, sir." Thus, there is substantial competent evidence that Evans was not coerced into entering this plea agreement.

*There is substantial competent evidence that Evans' pleas were fairly and understandingly made.*

Finally, although Evans does not explicitly make an argument under the third *Edgar* factor, he essentially argues that he did not enter this plea deal fairly or understandingly. Evans points to several things that could support this contention: he was "confused" and "very emotional during the hearing and was 'crying' frequently"; he never saw a written copy of the plea agreement until the plea hearing; he "simply did what Mr. Hansen told him to do"; and the general hastiness in which Hansen completed the acknowledgments form.

Each of these assertions, however, are either directly controverted by his attorneys' testimony or not supported by the record on appeal. For example, both attorneys denied seeing Evans emotional during the plea hearing, and Hansen testified that Evans was "absolutely not" crying. And other than the district court pointing out during the plea hearing that there was a Kleenex box near Evans that he could use, nothing in the record suggests that Evans exhibited uncontrollable and constant crying. As for Evans' assertion that "the offenses [he] was going to plead to were never reduced to writing prior to the hearing," this assertion is directly contradicted by Leon's testimony that he went over the written plea agreement with Evans on two occasions, and undermined by Hansen's testimony that he also went over the written plea agreement with Evans before the plea hearing. Thus, the district court resolved conflicting evidence about Evans' various assertions in favor of his two attorneys, and this court should not reweigh the credibility of the witnesses on appeal. *Bilbrey*, 317 Kan. at 63.

Evans goes on to argue that he entered the plea agreement unknowingly because he essentially did whatever Hansen told him to do, highlighting the fact that he asked Hansen, "What am I supposed to say?" after the court asked him a question during the plea colloquy. But this discussion between Evans and Hansen does not support Evans' argument because Evans only asked this question in response to a poorly worded question from the court:

> "THE COURT: Sir, do you have a—you have right against self-incrimination and that by entering into this agreement you may be waiving that right?
> "THE DEFENDANT: What am I supposed to say?
> "MR. HANSEN: Say what now?
> "THE DEFENDANT: Am I supposed to say yes?
> "MR. HANSEN: I was—
> "THE COURT: All right. Sir, you have the right to self—you have the right against self-incrimination. So you may have heard you have the right to stand silent, everything you say and can and will be used against you.

15

"THE DEFENDANT: Yeah.

"THE COURT: Anything you might say might be used against you in the court of law. By going forward with this today in this hearing you may be waiving that right, because I'm going to be asking you questions which would incriminate you with regard to these crimes.

"THE DEFENDANT: Yes.

"THE COURT: Do you want to talk to your attorney about that?

"MR. HANSEN: You understand that, right?

"THE DEFENDANT: Yes, yes."

Thus, rather than being confused by the substance of the plea agreement or its consequences, it is more likely that Evans was simply confused by the way in which the court phrased the question. Moreover, while Evans asserts that Hansen told him what to say, the record shows that Hansen merely asked Evans whether he understood what the court was explaining to him.

Finally, Evans points to the "lack of detailed preparation and a hasty environment" to support his argument that he did not enter this plea agreement fairly or knowingly. But the record contains substantial competent evidence that Evans understood the plea agreement's terms and knew its consequences before he accepted it. As discussed, Evans had reviewed this plea agreement at least three times with his attorneys before the plea hearing. Leon also testified that he had no indication that Evans was unable to understand the terms of the agreement or was unwilling to accept it. And Evans executed the agreement, which plainly stated that a dispositional departure was not a matter of right but up to the discretion of the sentencing judge and contained an express representation that he understood the possible penalties for the pleaded-to offenses. Finally, Evans only moved to withdraw his plea after sentencing, which raises a reasonable inference that he only did so because he was unhappy with the sentence he received.

Additionally, even though Evans does not argue that his medications rendered his guilty pleas unknowing or involuntary, the court went so far as to specifically address Evans' medications and to confirm that Evans was satisfied that he was of the state of mind to fully understand and appreciate the seriousness of the proceedings; Evans assured the court he knew of no reason the court should refuse to accept the plea.

In sum, the district court accepted Evans' guilty pleas, finding that they were fairly and understandably made, and Evans' representations at the plea colloquy alone provide adequate basis for this conclusion. See *State v. Green*, 283 Kan. 531, 548, 153 P.3d 1216 (2007) (noting the defendant's articulate colloquy at the plea hearing showed that her plea was fairly and understandingly made). In addition, faced with Evans' new claim that the representations he made at the hearing were false, the district court's resolution given the conflicting testimony necessarily incorporates what is "'tantamount to a credibility determination'" that an appellate court is "'ill-suited to question.'" *Shields*, 315 Kan. at 140-41.

Thus, at its core, Evans' claim is simply that the district court failed to give greater weight to his testimony during the plea-withdrawal hearing. But that contention is outside the scope of appellate review. See *Bilbrey*, 317 Kan. at 63. Evans' has failed to meet his burden of proof to establish manifest injustice to allow him to withdraw his plea. Accordingly, we affirm the district court's denial of Evans' postsentence motion to withdraw his plea.

Affirmed.