(239 P.3d 857)
No. 102,060

STATE OF KANSAS, *Appellee,* v. DONALD G. ATTEBERRY,
*Appellant.*

Opinion filed September 3, 2010.

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, for appellant.

*Scott M. Schultz*, special assistant district attorney, Office of the Securities Commissioner, *Chadwick Taylor*, district attorney, and *Steve Six*, attorney general, for appellee.

Before STANDRIDGE, P.J., GREEN and HILL, JJ.

GREEN, J.: This is a second appeal by Donald G. Atteberry. In this appeal, Atteberry seeks review of the trial court's judgment denying Atteberry's pro se motion to withdraw his plea filed under K.S.A. 22-3210(d). Atteberry entered a plea of no contest to 34 counts of violations of the Kansas Securities Act (the Act) and 2 counts of the theft by deception. Atteberry moved to withdraw his plea after sentencing and while his first direct appeal was pending. His first appeal was dismissed for lack of jurisdiction under *State v. Johnson*, 286 Kan. 824, 190 P.3d 207 (2008). Atteberry based his motion to withdraw his plea primarily on his trial counsel's ineffective assistance. He maintained that his trial counsel failed to raise the affirmative defense that the promissory notes involved in the transactions at issue were exempt from the Act under K.S.A. 17-1261(i) (Furse 1995).

On appeal, Atteberry contends that the trial court wrongly denied his motion to withdraw his plea under K.S.A. 22-3210(d). We disagree. Accordingly, we affirm.

On October 11, 2001, the Kansas Securities Commissioner issued an emergency cease and desist order to Atteberry for allegedly violating the Act in connection with an investment opportunity he was offering to Kansas residents. The investment involved the exportation of cattle embryos to Europe. In May 2005, the securities commissioner issued another emergency cease and desist order to Atteberry for his alleged continuing violations of the Act. Atteberry requested a hearing to contest the cease and desist order, but he was arrested before the scheduled hearing.

The State filed its complaint against Atteberry on August 19, 2005, and initially charged him with six counts of violating the Act, K.S.A. 17-1252 *et seq*. On October 14, 2005, the State filed an amended complaint in which it alleged 36 counts against Atteberry. Of those 36 counts, 34 counts were for alleged violations of the Act, Chapter 17, Article 12, and the remaining 2 counts were al-

legations of theft by deception in violation of K.S.A. 21-3701. More specifically, Atteberry was charged with 7 counts of securities fraud in violation of K.S.A. 17-1253; 9 counts of offer or sale of unregistered securities in violation of K.S.A. 17-1255; 8 counts of failure to register as broker-dealer or agent in violation of K.S.A. 17-1254; and 10 counts of violating the emergency cease and desist order in violation of K.S.A. 17-1267(a). According to the amended complaint, the alleged unlawful acts took place on various dates between January 2003 and June 2005.

Initially, Atteberry was represented by retained counsel, Thomas D. Haney, who entered his appearance on August 24, 2005. As of July 17, 2006, Atteberry, through counsel, had not told the trial court or the State "of any defenses he [intended] to present at trial." At a pretrial conference and motion hearing on September 28, 2006, the court confirmed with Haney that Atteberry had "not disclosed the nature of the defense other than a general denial."

The day following that hearing, Haney moved to withdraw as Atteberry's attorney, citing "an irreconcilable conflict" between himself and Atteberry. In his motion to withdraw, Haney also stated he could not "provide the defendant constitutionally effective assistance of counsel due to the conflict." On October 6, 2006, Haney moved a second time to be allowed to withdraw as Atteberry's attorney and told the trial court that he had been discharged by Atteberry. At the time of this motion, the jury trial in this case had been scheduled to begin on October 16, 2006. The trial court permitted Haney to withdraw, and Carl E. Cornwell entered his appearance as new retained counsel on October 10, 2006.

Because Atteberry's new counsel needed time to review discovery documents and otherwise prepare Atteberry's defense, Cornwell requested a continuance. To meet the requirements for a speedy trial, Atteberry's trial needed to commence on or about October 20, 2006. In order to accommodate defense counsel's need to prepare and his existing trial schedule, Atteberry agreed to waive his right to a speedy trial. The trial was rescheduled for April 2, 2007.

Shortly before the new trial date, Atteberry changed his plea from not guilty to no contest on all 36 counts of the first amended

complaint. At the beginning of the plea hearing, the trial court questioned the parties on whether a plea agreement or any agreements on sentencing had been reached. The parties told the court that there were no plea or sentencing agreements.

The State presented facts relating to each count, and Atteberry admitted that those facts could be presented at trial. After hearing the State's factual basis for all counts, Atteberry changed his plea to no contest. The trial court accepted Atteberry's offer to change his plea and accepted his plea of no contest to each of the 36 counts. The court found Atteberry guilty as charged for each of the 36 counts.

Nearly a year before sentencing and 9 months before Atteberry changed his plea to no contest, the State filed a notice of intent to request an upward durational departure under K.S.A. 21-4718(b). The State contended that "a fiduciary relationship . . . existed between the defendant and the victims" and that several counts "involved victims that were particularly vulnerable due to age" or other infirmity. At the conclusion of the plea hearing, Cornwell told the trial court that a motion for both dispositional and durational departure would be filed on behalf of Atteberry. Although the appearance docket for this case does not list a defense departure motion, one was apparently filed with the trial court.

For the primary or base count, unlawful sale of securitiesa level 4 nonperson felony, the trial court imposed a presumptive sentence of 43 months. The sentence of 43 months was the upper level sentence within the grid block for an offender with a criminal history score of I. The court then pronounced the sentences for counts 2 through 36.

A special rule that is part of the Act found at K.S.A. 17-1254(a) required a presumptive sentence of imprisonment regardless of its location on the sentencing grid. The court ordered the remaining counts to be served consecutive to Count 1, the base count of 43 months. The trial court noted that this would result in a sentence of 792 months. Due to the Kansas Sentencing Guidelines requirement that the controlling sentence cannot be more than twice the base count (K.S.A. 21-4720[b][4]), the court reduced the sentence to 86 months of confinement and 36 months of post-release su-

pervision. The court also ordered Atteberry to pay restitution in the amount of $940,250. The court noted that Atteberry had requested a dispositional and durational departure and had asked for probation. The court, however, found that Atteberry had not met his burden of showing a substantial and compelling reason for granting him a departure sentence. As a result, the trial court denied the motion.

Atteberry filed a timely notice of appeal. Nevertheless, his first appeal was dismissed for lack of jurisdiction under *State v. Johnson*, 286 Kan. 824, 190 P.3d 207 (2008).

While his first appeal was pending, Atteberry moved pro se to withdraw his plea under K.S.A. 22-3210(d). In his motion, Atteberry argued that the promissory notes used in his transactions were exempt from the Act under K.S.A. 17-1261(i). Atteberry also argued that he was denied due process because he did not receive notice of the exemption under K.S.A. 17-1261(i) before entering his plea. Later, Atteberry filed a pro se first amended motion to withdraw his plea. In his amended motion, Atteberry asserted two additional issues.

On January 29, 2009, the trial court received the mandate in Atteberry's first appeal from this court. This court granted the State's request to dismiss the appeal for lack of jurisdiction. Later, our Supreme Court denied Atteberry's petition for review.

The State did not file a response to Atteberry's motion to withdraw his plea. On February 9, 2009, the trial court entered a memorandum decision and order denying Atteberry's motions to withdraw his plea. The court addressed Atteberry's motions as if they were filed under K.S.A. 22-3210(d), as cited in the motions, and under K.S.A. 60-1507. The trial court did not conduct an evidentiary hearing due to its finding that Atteberry was not entitled to relief. The court further determined Atteberry was not entitled to appointed counsel because the motions did not present "substantial questions of law or triable issues of fact."

*Plea Withdrawal—K.S.A. 2009 Supp. 22-3210(d)*

K.S.A. 2009 Supp. 22-3210(d) governs a motion to withdraw plea, providing:

"(1) A plea of guilty or nolo contendere, for good cause shown and within the discretion of the court, may be withdrawn at any time before sentence is adjudged.

"(2) To correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea."

Thus, the level of proof for a defendant seeking to withdraw a plea depends on whether the motion is filed before or after sentencing: if prior, the trial court has discretion to permit withdrawal of pleas if a defendant shows "good cause"; if after, the trial court may permit a defendant to withdraw a plea only upon a showing of "manifest injustice."

Atteberry moved to withdraw his plea after sentencing. This court has defined the "manifest injustice" standard of proof to require a defendant to show that it would be "obviously unfair or shocking to the conscience" if the defendant is not allowed to withdraw his or her plea. See *State v. Barahona*, 35 Kan. App. 2d 605, 608-09, 132 P.3d 959, *rev. denied* 282 Kan. 791 (2006).

Our courts have generally considered three factors in evaluating both pre- and post-sentencing motions to withdraw pleas: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made; see *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). Atteberry argues his plea was not fairly and understandingly made because his counsel was ineffective, invoking both the first and third factors.

In *State v. Aguilar*, 290 Kan. 505, 231 P.3d 563 (2010), our Supreme Court held that it is improper to mechanically apply these " '*Edgar* factors' " to demand that a defendant demonstrate ineffective assistance of counsel rising to the level of a violation of the Sixth Amendment in a *presentence* motion to withdraw plea. 290 Kan. at 512-13.

With regard to *post-sentence* motion to withdraw a plea, *Aguilar* held that "it *may* be logical and fair to equate the K.S.A. 22-3210(d) manifest injustice standard governing a post-sentence plea withdrawal to the high burden imposed on a constitutional claim of ineffective assistance." (Emphasis added.) 290 Kan. at 513 (citing and comparing cases applying standard of deficient performance

plus prejudice in *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 [1984], with cases applying the "softened *Strickland* standard" employed in *Mickens v. Taylor,* 535 U.S. 162, 168, 152 L. Ed. 2d 291, 122 S. Ct. 1237 [2002], when reviewing ineffective assistance claim based on conflict of interest, which requires proof of existence of conflict with actual effect on representation).

Atteberry's claim that he should be allowed to withdraw his plea due to ineffective assistance of counsel is not based on a conflict of interest, so the heightened *Strickland* burden applies here. Accordingly, Atteberry has to prove manifest injustice will result if he is not allowed to withdraw his plea because (1) his counsel's performance fell below the standard of reasonableness; and (2) a reasonable probability exists that, but for counsel's errors, he would not have pled no contest and would have insisted on going to trial. See *State v. Adams,* 284 Kan. 109, 118, 158 P.3d 977 (2007) (applying this two-step test to defendant's claim that plea resulted from ineffective assistance of counsel).

*Standard of Review*

The parties agree that this court's review is limited to determining whether the trial court abused its discretion in denying Atteberry's pro se motions to withdraw his plea; see *State v. Woodward,* 288 Kan. 297, 299, 202 P.3d 15 (2009) ("We have repeatedly said that the denial of a post-sentencing motion to withdraw a plea lies within the trial court's discretion, and an appellate court should not disturb that ruling absent an abuse of discretion."). "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. [Citation omitted.]" *State v. Gant,* 288 Kan. 76, 81-82, 201 P.3d 673 (2009). Atteberry has the burden of establishing that the trial court abused its discretion; see *Woodward,* 288 Kan. at 299.

On the other hand, this court has suggested that where a defendant's post-sentencing motion can be construed as both a motion to withdraw a plea and a K.S.A. 60-1507 motion, appellate

review of the summary denial of the motion is de novo; see *Wilkinson v. State*, 40 Kan. App. 2d 741, 743-44, 746, 195 P.3d 278 (2008), *rev. denied* 289 Kan. 1286 (2009) (construing defendant's pro se K.S.A. 60-1507 motion as post-sentencing motion to withdraw plea based on ineffective assistance of counsel and conducting unlimited review of trial court's summary denial of motion without evidentiary hearing); *Barahona*, 35 Kan. App. 2d at 615 (noting *State v. Jackson*, 255 Kan. 455, 458, 874 P.2d 1138 [1994], applied procedure for K.S.A. 60-1507 motions while addressing motion to withdraw plea under K.S.A. 22-3210[d] to hold that because defendant failed to present colorable claim for ineffective assistance of counsel, trial court properly dismissed claims without evidentiary hearing); accord *Trotter v. State*, 288 Kan. 112, 132, 200 P.3d 1236 (2009) (when trial court summarily denies K.S.A. 60-1507 motion, appellate court conducts de novo review to determine whether motion, files, and records of the case conclusively establish movant not entitled to any relief).

Here, the trial court held that Atteberry "has not established entitlement to relief under K.S.A. 22-3210(d) or under K.S.A. 60-1507." Citing K.S.A. 60-1507, K.S.A. 22-4506(b), and Supreme Court Rule 183(h) (2009 Kan. Ct. R. Annot. 251), the trial court further held that the motions and files of Atteberry's case conclusively established no basis upon which relief could be granted. Thus, the court concluded it could summarily deny Atteberry's motions without appointing counsel, providing for Atteberry's presence, or conducting an evidentiary hearing. Accordingly, this court has de novo review.

*Was Counsel Ineffective for Not Advising Atteberry He Had an Affirmative Defense Based on the Commercial Paper Exemption?*

The Act in effect when Atteberry allegedly violated its provisions made it unlawful for any person to solicit, offer, or sell any security in Kansas unless it was registered under the provisions of the Act or it was exempt from registration under K.S.A. 2002 Supp. 17-1261 (categorical exemptions) or K.S.A. 2002 Supp. 17-1262 (transactional exemptions); see K.S.A. 2002 Supp. 17-1252 *et seq.* These statutory exemptions are affirmative defenses that a defend-

ant bears the burden of establishing. K.S.A. 2002 Supp. 17-1272; *cf. State v. Kershner*, 15 Kan. App. 2d 17, 801 P.2d 68 (1990) (holding K.S.A. 17-1262 exemption is an affirmative defense, and K.S.A. 17-1272's requirement that defendant claiming benefit of exemption prove its applicability does not unconstitutionally shift burden of proof to defendant).

In his first issue on appeal, Atteberry argues that he should have been allowed to withdraw his plea because his counsel was ineffective for failing to tell him that he had an affirmative defense to the charges against him; that is, that the promissory notes he issued to his investors were exempt from the Act under K.S.A. 2002 Supp. 17-1261(i). That statute exempts from the Act a security that meets the following criteria:

"Any commercial paper which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which evidences an obligation to pay cash within nine months of the date of issuance, exclusive of days of grace, or any renewal of such paper which is likewise limited, or any guarantee of such paper or of any such renewal." K.S.A. 2002 Supp. 17-1261(i) (hereafter "the commercial paper exemption").

The trial court rejected Atteberry's contention, summarily holding that "[a]s a matter of law, the transactions resulting in the conviction were not subject to exemptions under the Securities Act."

The availability of the commercial paper exemption as an affirmative defense is a question of law involving statutory interpretation, over which this court exercises unlimited review; see *State v. Jefferson*, 287 Kan. 28, 33, 194 P.3d 557 (2008) (interpretation of statute is question of law subject to unlimited appellate review).

Atteberry argues that the commercial paper exemption applies because the maturity periods of the promissory notes he issued were all less than 9 months. His argument impliedly concedes that the notes are "securities," covered by the Act. Consequently, we need not address whether Atteberry's promissory notes are securities; see K.S.A. 2002 Supp. 17-1252(j) (defining "security" under the Act).

In support, Atteberry relies solely on *State v. Hodge*, 204 Kan. 98, 460 P.2d 596 (1969), which seems to be the only published Kansas decision to have considered this commercial paper exemp-

tion. In *Hodge*, our Supreme Court rejected the defendant's claim that the securities underlying his convictions were exempt under the commercial paper exemption, finding the defendant had "conveniently overlook[ed] the plain fact the documents in question call[ed] for final payment one year after the date of issuance." 204 Kan. at 106. Thus, the court held: "Assuming [the] documents to be promissory notes, as the [defendant] contend[ed], they [did] not fall within the [commercial paper] exemption asserted" because the maturity period was greater than 9 months. 204 Kan. at 106.

There is no dispute here that the promissory notes issued by Atteberry were for a maturity period of less than 9 months. Instead, the primary issue underlying Atteberry's argument on appeal is the following: Were the promissory notes issued by Atteberry "commercial paper" as that term is used in the exemption?

Whether the securities at issue qualified as commercial paper under the exemption was apparently not in dispute in *Hodge*. The State argues our Supreme Court acknowledged in dicta that the exemption was intended only to apply to prime quality commercial paper eligible for discount at the Federal Reserve Banks. Nevertheless, it seems that the State is referring to *Hodge*'s quote from a treatise discussing the reasons for the 9-month maturity date limit. *Hodge* did not quote the treatise for the purposes of deciding which securities do or do not qualify as commercial paper under the exemption; see 204 Kan. at 106 (quoting " 'Draftsmen's Commentary to § 402 [a][10]' of the Uniform Securities Act [Blue Sky Law, Loss and Cowett [1958], p. 361").

Apparently, neither party recognized that *Hodge* did explicitly consider the issue of whether the promissory notes in that case were commercial paper. Specifically, before addressing the maturity date issue on which the issue was decided, our Supreme Court summarily stated: "It must be conceded promissory notes by the law-merchant fall under the designation of commercial paper." 204 Kan. at 105. The law merchant is the "[b]ody of law governing commercial transactions which had its origin in common law of England regulating merchants." Black's Law Dictionary 886 (6th ed. 1990). It is apparently the common-law predecessor of the Uni-

form Commercial Code (UCC). *Cf.* K.S.A. 2009 Supp. 84-1-103(b) (noting that "[u]nless displaced by the particular provisions of the [UCC], the principles of law and equity, including the law merchant . . . supplement its provisions").

The *Hodge* court's apparent equating of commercial paper in the exemption from the Act with commercial paper under the UCC's common-law predecessor is contrary to the rationale of other authorities that have since construed the commercial paper exemption found in other states' and federal securities acts. As thoroughly briefed by the State, those authorities recognize that the commercial paper exempted from regulation by federal and other states' securities acts is commonly understood to not encompass everything considered commercial paper under the UCC. Rather, those authorities uniformly hold that the commercial paper exemption applies only to the specialized commercial paper market used by large banks and corporations to handle their large and recurrent short-term borrowing and investment needs. See Long, Blue Sky Law § 6:46 (Vol. 12, Securities Law Series) (2010) (citing various authorities in recognizing that because "[t]he sophistication of the investors and the need for speed in the completion of the transaction provide adequate policy reasons for creating an exemption from the registration provisions of the securities act," the commercial paper exemption "is not generally available for paper or transactions which do not come within the policy reasons for its creation").

Thus, securities act commercial paper exemptions do not broadly encompass all negotiable instruments as defined in UCC or other commercial statute. 1 Hazen, Treatise on the Law of Securities Regulation § 4.4 (6th ed. 2009) (citing various cases and releases from Securities Exchange Commission that recognize type of short-term commercial paper eligible for exemption in Securities Act of 1933, 15 U.S.C.A. § 77[3][a][3], must be " '[1] prime quality negotiable commercial paper [2] of a type not ordinarily purchased by the general public, that is [3] paper issued to facilitate well recognized types of current operational business requirements and [4] of a type eligible for discounting by Federal Reserve banks[.]' "); Comment, *The Commercial Paper Market and the Securities Acts,*

39 U. Chi. L. Rev. 362, 363-64 (1972) (explaining, "[c]ommercial paper consists of unsecured, short-term promissory notes issued by sales and personal finance companies; by manufacturing, transportation, trade, and utilities companies; and by the affiliates and subsidiaries of commercial banks" and discussing additional attributes thereof).

Importantly, in 1994, after our Supreme Court's decision in *Hodge* and well in advance of the charges filed against Atteberry for violations of the Act, Kansas' Securities Commissioner promulgated K.A.R. 81-5-11(2006). That regulation provided that "[a] security shall be exempt under K.S.A. [2002 Supp.] 17-1261(i) if it is prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements." K.A.R. 81-5-11(2006); see K.S.A. 2002 Supp. 17-1270(e) (granting commissioner authority to adopt, amend, and revoke rules and regulations, orders, and forms "as may be necessary to carry out the provisions of [the] act" and allowing commissioner, in carrying out these duties, to "cooperate with the securities administrators of the other states and the securities and exchange commission with a view to effectuating the policy of this statute to achieve maximum uniformity in the form and content of registration statements, applications, and reports wherever practicable"); *cf. Kershner*, 15 Kan. App. 2d at 18 (noting Kansas Securities Act is patterned on Uniform Securities Act, which, in turn, is patterned on Federal Securities Act of 1933, so "Kansas Act should be applied by giving particular attention to federal decisions and decisions of sister states adopting the Uniform Act").

Although K.A.R. 81-5-11 was repealed in 2007, it was in effect at all times pertinent to this appeal; see K.A.R. 81-5-11 (2009). Assuming our Supreme Court's seemingly contrary interpretation of commercial paper in *Hodge* is not dicta, we determine that if our Supreme Court would revisit this issue now, it would conclude that the more narrow definition previously cited of commercial paper in K.A.R. 81-5-11 (2006) supersedes *Hodge*'s more broad definition.

Because the promissory notes issued by Atteberry were not commercial paper under the narrow definition of commercial paper, the trial court was correct in concluding that the commercial paper exemption does not apply. As a result, Atteberry cannot establish the first prong of his ineffective assistance of counsel claim because his counsel could not have been ineffective for failing to tell Atteberry of an inapplicable affirmative defense.

*Even if the Affirmative Defense Was Inapplicable, Can This Court Find Counsel Was Ineffective for Failing to Argue that the Commercial Paper Exemption Is Unconstitutionally Vague?*

Atteberry acknowledges in his reply brief that the commercial paper exemption was arguably not available to him in light of the more narrow definition of "commercial paper" discussed in the previous issue. Nonetheless, he briefly argues that this court should find his counsel was ineffective for failing to argue that his due process rights were violated because the commercial paper exemption was not sufficiently definite to warn him that his conduct was prohibited under the Act.

In support, Atteberry relies on *People v. Dempster*, 396 Mich. 700, 242 N.W.2d 381 (1976), which interpreted a similar commercial paper exemption under Michigan's Uniform Securities Act. The Michigan Supreme Court rejected the defendants' attempts to equate commercial paper as used in the exemption with commercial paper under the UCC. Instead, that court held as a matter of first impression that Michigan's commercial paper exemption applied to only those securities that were "virtually riskless, such as government bonds, nationally listed securities, etc. . . . [or] are 'so inherently gilt-edge, or so unlikely to be utilized in a deceptive scheme, that the Michigan Blue Sky Law exempts them from the prior registration requirement.' [Citation omitted.]" 396 Mich. at 710-11; see also *State v. Crooks*, 84 Or. App. 440, 443-45, 734 P.2d 374 (1987) (citing *Dempster* in rejecting defendant's argument that Oregon Securities Act's commercial paper exemption broadly encompasses all negotiable instruments as defined in Article 3 of the UCC and instead more narrowly defining commercial paper under the exemption to "include[ ] only unsecured short term negotiable

debt instruments issued by commercial entities"); accord *Securities Industry Assn. v. Board of Governors,* 468 U.S. 137, 140 n.1, 82 L. Ed. 2d 107, 104 S. Ct. 2979 (1984) (defining " 'commercial paper' " in a generic sense as referring to "unsecured, short-term promissory notes issued by commercial entities").

After placing this " 'clarifying gloss' " upon Michigan's commercial paper exemption, the Michigan Supreme Court reversed the defendants' convictions, concluding "the term 'commercial paper' standing by itself was not sufficiently definite to allow [the defendants'] conviction[s] [for violations of Michigan's Uniform Securities Act] to stand." *Dempster,* 396 Mich. at 716-17. In so holding, the Michigan Supreme Court agreed with the defendants that the instruments in that case fit within an acceptable definition of commercial paper upon which the defendants could rightfully rely to conclude their securities were exempt because the statutory language of Michigan's commercial paper exemption did not clearly indicate otherwise. *Dempster,* 396 Mich. at 714-18 (citing *United States v. Harriss,* 347 U.S. 612, 617, 98 L. Ed. 989, 74 S. Ct. 808 [1954] [constitutional requirement of definiteness violated if criminal statute fails to give person of ordinary intelligence fair notice that contemplated activity prohibited by statute]; *Cline v. Frink Dairy Co.,* 274 U.S. 445, 71 L. Ed. 1146, 47 S. Ct. 681 [1927] [exemptions and provisos within criminal statute must be defined with same specificity]).

Atteberry argues that Kansas' commercial paper exemption is likewise unconstitutionally vague, so his counsel's failure to argue "that [Atteberry] could claim the exemption because the statute was not sufficiently definite" fell below the standard of reasonableness.

We point out several reasons why we should reject this contention. First, Atteberry has failed to sufficiently brief the issue by not citing any supporting authority addressing how Kansas courts analyze the void-for-vagueness issue; see *State v. Holmes,* 278 Kan. 603, 622, 102 P.3d 406 (2006) (appellant abandons issue on appeal by not adequately briefing issue or by failing to cite legal authority or argument to support contention). Second, Atteberry cannot raise grounds for counsel's ineffectiveness not raised below; see

*State v. Warledo,* 286 Kan. 927, 938, 190 P.3d 937 (2008) (issues not raised before trial court cannot be raised on appeal). Third, Atteberry cannot raise constitutional grounds for reversal for the first time on appeal; see *State v. Gant,* 288 Kan. 76, 82, 201 P.3d 673 (2009) (constitutional grounds for reversal asserted for first time on appeal not properly before appellate court).

Granted, there are exceptions to these preservation rules and this court has considered a new legal theory raised for the first time on appeal (1) when the issue involved only a question of law arising on proved or admitted facts and was finally determinative of the case; (2) when consideration of the theory was necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) when the judgment of the trial court can be upheld on appeal if the trial court was right for the wrong reason; see *State v. Hawkins,* 285 Kan. 842, 845, 176 P.3d 174 (2008).

Whether a statute is unconstitutionally vague is a question of law; see *State v. Rucker,* 267 Kan. 816, 830, 987 P.2d 1080 (1999) (whether statute is unconstitutionally vague is question of law over which appellate review is de novo). Moreover, "[t]he constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution." 267 Kan. at 830. We will consider Atteberry's contention based on exceptions 1 and 2 previously mentioned.

Kansas courts apply a void-for-vagueness analysis similar to that applied in *Dempster.* That is, this court will find a statute unconstitutionally vague and indefinite, in violation of due process, when its language fails to convey a sufficiently definite warning of the conduct that is criminally proscribed, as measured by common understanding and practice. See *Rucker,* 267 Kan. at 830-831; see also *State v. Watson,* 273 Kan. 426, 434, 44 P.3d 357 (2002) ("due process requires nondeceptive notice such that every person is able to know with certainty when he or she is committing a crime").

In *Dempster,* the defendants produced evidence that persons in charge of enforcing Michigan's securities law believed that if the instruments at issue fit within the UCC concept of commercial paper, they would be exempt from registration. Because the in-

struments involved arguably fit within that definition, the defendants contended that they could freely rely on such a definition unless the statutory language clearly indicated otherwise. The Michigan Supreme Court agreed, concluding that because the statutory commercial paper exemption was ambiguous, the defendants lacked the " 'fair warning' " demanded by the Constitution that their conduct would render them liable to criminal penalties. 396 Mich. at 715-16.

Atteberry's due process argument in his reply brief overlooks two important facts that distinguish his case from the holding in *Dempster*.

First, Michigan apparently did not have an administrative regulation, which further defined the commercial paper exemption like that found in K.A.R. 81-5-11 (2006). Kansas' regulation provides the fair warning lacking in *Dempster*. In other words, for purposes of due process, K.A.R. 81-5-11 (2006) clearly indicates that the promissory notes issued by Atteberry were not commercial paper exempted from the Act.

Second, and perhaps more importantly, unlike the defendants in *Dempster*, Atteberry had prior actual notice that his actions were considered criminal. On October 11, 2001, under K.S.A. 17-1266a (Furse 1995), the Kansas Securities Commissioner issued an emergency cease and desist order that was served upon Atteberry. That order required Atteberry to do the following:

" 'Immediately CEASE and DESIST in the State of Kansas from soliciting offers to buy or making offers to sell, or effecting or transacting sales of the securities, i.e. promissory note [*sic*], or the securities of any other person or issuer, or directly or indirectly aiding and assisting in the same or attempting to do the same, (1) unless and until such securities have been registered for the offer and sale pursuant to the provisions of the Kansas Securities Act, or unless and until such securities are specifically exempt from the registration requirements of the Kansas Securities Act; and (2) unless and until respondents Dr. Don Atteberry and all other affiliates, employees, or contractors of the respondents who are to be engaged in such solicitations, offers, and sales first become registered as broker-dealers or agents pursuant to the provisions of the Kansas Securities Act, or unless and until such persons are specifically exempt from such registration requirements of the Kansas Securities Act; and (3) unless and until the respondents refrain from all acts and practices which constitute violations or are about to constitute violations of the Kansas Securities Act.' "

There seems to be no dispute, nor does Atteberry contest, that he continued to offer the same cattle embryo investment opportunities even after he was served with this cease and desist order. He likewise continued his behavior after yet another cease and desist order was served upon him on May 14, 2005, which activity apparently led to the filing of the charges to which Atteberry ultimately pled no contest. Moreover, unlike the defendants in *Dempster*, Atteberry never produced evidence that State officials responsible for enforcing compliance with the Act ever indicated the promissory notes Atteberry issued may fit within Kansas' commercial paper exemption.

Thus, we conclude that Atteberry had notice that his conduct was criminal under the Act, which was sufficient to satisfy his constitutional due process rights. *Cf. Dempster*, 396 Mich. at 717 n.11 (noting without deciding that the issuance of cease and desist orders and injunctions under Michigan's Uniform Securities Act could satisfy due process notice requirements in a particular securities law case where the activity continued thereafter).

*Do Atteberry's Additional Contentions About Why He Should Be Allowed to Withdraw His Plea, Which Were Raised For the First Time on Appeal, Have Merit?*

In his second issue, Atteberry contends that he should have been allowed to withdraw his plea to the securities fraud charges (Counts 1, 5, 10, 14, 19, 23, 28, and 33) because his counsel was ineffective in failing to argue that those crimes should be specific intent crimes. In his third issue, Atteberry also briefly argues that his counsel was ineffective for telling him to enter a plea to all of the charges against him when there was no plea agreement and the State had requested an upward departure sentence.

As set forth earlier, this court generally does not consider issues raised for the first time on appeal; see *Warledo*, 286 Kan. at 938. Nevertheless, Atteberry requests that this court consider the issues under either the first or second exception previously cited to this preservation rule.

We will assume for argument sake that one of the previously mentioned exceptions applies. With regard to his argument that

counsel should have argued that the securities fraud charges were specific intent crimes, Atteberry acknowledges that our courts have held crimes under the Act are general intent crimes; see *Hodge*, 204 Kan. at 107 ("No specific intent is necessary to constitute the offense where one violates the securities act except the intent to do the act denounced by the statute."); *State v. Mehling*, 34 Kan. App. 2d 122, 126-27, 115 P.3d 771, *rev. denied* 280 Kan. 988 (2005) (noting *Hodge*'s ruling on intent element is binding upon this court and consistent with United States Supreme Court precedent considering § 17 of the Securities Act of 1933, which K.S.A. 2002 Supp. 17-1253 closely follows).

Moreover, the assistance of Atteberry's counsel could not be deemed constitutionally ineffective when there has been no indication from our Supreme Court that it intended to depart from its previous decisions on this issue. As a result, Atteberry's specific intent argument fails.

Second, the record reveals that Atteberry's decision to enter a plea despite the fact that there was no plea agreement was not the result of ineffective assistance of counsel.

Importantly, the United States Supreme Court has held that a constitutional infirmity that occurs in the proceedings before a prisoner's guilty plea does not, in and of itself, automatically establish the right to federal habeas relief based on a claim of ineffective assistance of the counsel who advised the prisoner to enter a plea. *Tollett v. Henderson*, 411 U.S. 258, 266-67, 36 L. Ed. 2d 235, 93 S. Ct. 1602 (1973). Rather,

"a guilty plea represents a break in the chain of events which has preceded it in the criminal process[, after which]. . . [the defendant] may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not ['within the range of competence demanded of attorneys in criminal cases'—the standard for ineffectiveness of counsel] set forth in *McMann* [*v. Richardson*, 397 U.S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970)]." *Tollett*, 411 U.S. at 267.

See generally *State v. Muriithi*, 273 Kan. 952, 956, 46 P.3d 1145 (2002) (recognizing that " '[i]n the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a

restatement of the standard of attorney competence already set forth in *Tollett . . .* and *McMann.'* ").

The Supreme Court further explained:

"A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry. And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, [citation omitted], it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings.

"The principal value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client, and such representation frequently involves highly practical considerations as well as specialized knowledge of the law. Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, see *Brady v. United States*, [397 U.S. 742] at 751-752[, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970)], or by contesting all guilt, see *Santobello v. New York*, 404 U.S. 257, [30 L. Ed. 2d 427, 92 S. Ct. 495] (1971). A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement, such as unconstitutional grand jury selection procedures, might be factually supported." *Tollett*, 411 U.S. at 267-68.

Atteberry's sentencing strategy was to accept blame for his actions but to furnish a substantial and compelling reason necessary to obtain probation. Atteberry and his attorney, Cornwell, decided that because Atteberry was a veterinarian with specialized knowledge in cattle embryo transfer that he would urge the trial court to accept his departure motion based upon his ability to repay the large sum of restitution that would be ordered in the case.

At the June 21, 2007, sentencing, Cornwell gave the trial court insight into his reasoning of not entering into a plea agreement with the State:

"MR. CORNWELL: I met Mr. Atteberry, Dr. Atteberry, back in October of last year. Approximately that time I was in this courtroom and we set this case for trial. Dr. Atteberry, Don, and I worked and worked and talked and strategized

and looked at this thing. How did you get into it? What did you do? What was going on? And we came to the conclusion that we shouldn't, couldn't, wouldn't go to trial. I called and talked with Mr. Schultz, who has been very helpful, very professional, to try to work something out. Obviously, there is now a big contention about whether he is behind bars for a number years or whether or not he's going to be on probation. Right now, he is presumptive prison. My argument at the time, when I talked with Mr. Schultz, was, 'Let's pay these people back. That's the most important thing.' 'I've heard that story before, Mr. Cornwell, Carl.' So we became loggerheads. Because you always offer something, you always enter negotiations, you want to have options for your client. You want to try to figure out what's the best thing. The offer was level 4's, 43 months concurrent, go do your time.

"I talked with Dr. Atteberry about that because the potentiality was, if we didn't do that and we didn't go to trial, then we had to come in here and do what we did when we pled guilty, which was no contest to everything, because on his behalf I wanted to act like a lawyer, I wanted to defend him and I wanted to advocate for him."

Generally, a sentencing judge is guided by the following criteria in fashioning an appropriate sentence: (1) the disciplining of the offender, (2) the protection of society, (3) the potential for rehabilitation of the offender, and (4) the deterring of others from committing similar offenses. Obviously, one of the factors which the sentencing court may consider in determining the rehabilitative potential of a defendant is whether the defendant is willing to make restitution to the person or persons who have been injured or victimized by the offense.

As the State points out, if Atteberry chose to go to trial and the State's departure motions were granted, he could have easily received up to twice the sentence he received or 172 months. K.S.A. 21-4720(c)(2). The offer by the State to plead to level 4 securities fraud counts with a 43-month prison recommendation to the trial court was rejected by Atteberry. If going to trial was not an option, the only way to attempt to control whether Atteberry was placed on probation was to plead as charged and use a departure motion at sentencing to accomplish his goal of probation.

Viewing the representation of Atteberry's counsel as a whole, Atteberry has failed to overcome the presumption that his trial counsel's performance was effective. As a result, his argument fails.

Affirmed.