NOT DESIGNATED FOR PUBLICATION

Nos. 126,594
126,595

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JORDAN KRISTOPHER YARDLEY,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TYLER ROUSH, judge. Submitted without oral argument. Opinion filed March 7, 2025. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Caley B. Brand*, legal intern, *Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and COBLE, JJ.

PER CURIAM: After the district court revoked Jordan Kristopher Yardley's probation, he moved to withdraw his plea. Yardley alleged his mental health impaired his ability to enter his plea; he lacked sufficient time to review the plea agreement; plea counsel had failed to introduce exonerating evidence and had failed to communicate the consequences of his charges or the plea agreement details; and plea counsel and his law partner had coerced him into accepting the plea. The district court denied Yardley's

1

motion to withdraw his plea. Yardley appeals, yet having reviewed the record we find no reason to reverse.

*Factual and Procedural Background*

This case arises from Yardley's no contest pleas to charges in two cases: 19 CR 2045 and 19 CR 2274.

*19 CR 2045*

Yardley's charges in 19 CR 2045 were the focus of his motion to withdraw plea and are the centerpiece of his arguments on appeal. In 19 CR 2045, the State initially charged Yardley with two counts of child abuse and gave notice of intent to seek an upward durational departure based on aggravating factors. The State later amended its complaint to include one count of aggravated endangering a child, two counts of aggravated battery, and one count of child abuse based on the following facts.

On the evening of June 30, 2019, Yardley was at home with his two children, M.Y. and G.Y., while his wife, J.Z., was at work. Shortly after midnight, Yardley texted J.Z. stating: "'[M.Y.] is driving me insane. He's screaming at the top of his lungs for no reason.'" J.Z. provided suggestions for helping M.Y. and arrived home later that morning. J.Z. later awoke to M.Y. crying and saw that M.Y.'s face was swollen, and his eyes were not tracking movement. J.Z. and Yardley took M.Y. to Wesley Medical Center, where doctors discovered that M.Y. had a skull fracture and an epidural hematoma, a brain bleed typically caused by an artery being torn by a skull fracture. Doctors also found that M.Y. had a fractured wrist, estimating that the fracture had occurred one to eight weeks before. There were no external signs of the wrist fracture.

2

According to Yardley, around 10:30 p.m., he had put M.Y. on his and J.Z.'s bed while he went to make a bottle for M.Y. While he struggled with the machine they used to make bottles, he heard a thud followed by M.Y. crying. He found M.Y. on the hardwood bedroom floor but "was able to console" M.Y., believing that M.Y. "appeared fine" at the time. At the preliminary hearing, J.Z. testified that M.Y. had rolled off the bed and the couch before.

Dr. Janet Heflin, a pediatrician in the child at risk evaluation team at Wesley Medical Center, examined M.Y. for possible signs of child abuse. Dr. Heflin testified that given the nature of M.Y.'s wrist fracture, he could not have inflicted the injury himself. Dr. Heflin believed the wrist fracture was caused by a force such as "someone pulling on the hand or the shoulder . . . or pulling one way on the elbow and one way on the hand" or possibly by being shaken.

Dr. Heflin testified that M.Y.'s brain injury was an acute injury—caused by sudden movement or impact—and symptoms typically develop "a few hours up to a day" after the injury. Dr. Heflin agreed that a child could suffer a skull fracture from falling off a bed but testified that a fall from a bed onto a flat surface would not generate the impact necessary for an epidural hematoma. Instead, Dr. Heflin believed M.Y.'s brain injury was consistent with blunt force trauma. Dr. Heflin also testified that because the shoulder gets in the way, it is "much less common" for a child to fall and hit the side of the head, where M.Y.'s skull fracture and hematoma were located.

*19 CR 2274*

In 19 CR 2274, the State charged Yardley with six counts of domestic battery, one count of aggravated domestic battery, one count of aggravated battery, and one count of violation of a protective order. The State alleged Yardley committed these offenses against J.Z.

The State claimed the offenses in 19 CR 2274 occurred between August 2016 and August 2019. Counts I-VIII involve Yardley hitting, punching, choking, and grabbing J.Z.—leaving bruises and, in the case of count VI, fracturing J.Z.'s rib. Count IX (violation of a protective order) involved Yardley making jail phone calls to his mother, telling her to relay messages from him to J.Z., M.Y., and G.Y. when a protective order prohibited Yardley from contacting J.Z., M.Y., and G.Y. directly or indirectly. Yardley also asked his mother for J.Z.'s phone number, stating he wanted to "go after" J.Z. in divorce proceedings.

*Yardley Pleads No Contest*

In February 2022, Yardley pleaded no contest to aggravated battery and aggravated endangering a child in 19 CR 2045, and he pleaded no contest to all nine counts in 19 CR 2274. In exchange for Yardley's plea in 19 CR 2045, the State agreed to dismiss the one remaining child abuse charge and one of the aggravated battery charges. The parties agreed to recommend the standard grid box number and to run the two counts in 19 CR 2045 consecutive to each other but concurrent with the sentence in 19 CR 2274. The State also agreed to a bond at the time of the plea and to recommend a dispositional departure to probation if Yardley completed all conditions of his bond. The parties believed probation would be more conducive to reform than incarceration would be due to Yardley's history of addiction and mental health difficulties.

In exchange for Yardley's plea in 19 CR 2274, the State amended the aggravated battery charge in count VI from a severity level 4 offense to a severity level 5 offense. The parties agreed to recommend the standard grid box number for each count, to run each count concurrently, and to recommend probation upon successful completion of Yardley's bond conditions.

4

At sentencing, the district court found that Yardley had a criminal history score of A and followed the plea agreement in both cases. In 19 CR 2045, the court pronounced a 136-month prison sentence, running concurrently with a 130-month prison sentence in 19 CR 2274. The court granted a dispositional departure, suspended imprisonment, and sentenced Yardley to 60 months of probation.

*Probation Revocation*

In August 2022, Yardley's intensive supervision officer submitted a probation violation warrant for both cases, alleging that Yardley had committed a new crime, had failed to avoid establishments primarily selling alcohol, and had violated curfew. In September 2022, the intensive supervision officer submitted another warrant for both cases, alleging that Yardley had committed three new crimes. After an evidentiary hearing, the district court revoked Yardley's probation in both cases. Yardley appealed, but another panel of this court affirmed Yardley's probation revocation. *State v. Yardley*, No. 125,959, 2024 WL 1132740, at *3 (Kan. App. 2024) (unpublished opinion), *petition for rev. filed* April 15, 2024.

*Motion to Withdraw Plea*

In January 2023, Yardley filed a pro se amended motion to withdraw his plea of nolo contendere in both cases, which is the subject of this appeal. Yardley claimed his diagnoses of bipolar disorder, depression, and anxiety caused an "impairment to make a decision and understand the consequences of the charges." He also claimed he was told immediately prior to the hearing that he had to sign the plea documents and that he lacked enough time to review them with plea counsel. Yardley also raised these additional claims against plea counsel:

- Failure "to introduce exonerating evidence and medical reports";

- Failure to "communicate the consequences of the charges";
- Failure to "communicate all aspects of the plea deal"; and
- Plea counsel yelled at him and told him he would serve 45 years in prison if he declined the plea offer.

The district court held an evidentiary hearing at which three witnesses testified: Yardley, Peter Ninemire (a clinical social worker), and Yardley's plea counsel. In relevant part, Yardley testified to how M.Y.'s skull fracture happened; plea counsel's alleged failure to discuss trial strategy or an expert report that challenged Dr. Heflin's opinion; plea counsel's coercing him to enter a plea; and how his mental health affected his decision-making in entering the plea. Ninemire testified about his mental health diagnoses of Yardley; his concerns with Yardley entering a plea in 19 CR 2045; and how Yardley's mental health impacted his decision-making. Plea counsel testified to his recollection of trial strategy discussions, including the expert report; his and his law partner's lack of coercion of Yardley; and his observations of Yardley's mental health.

After reviewing the filings and plea hearing transcript, the district court found that Yardley understood the terms of his plea agreement. The court concluded the plea agreement was consistent with Yardley's desire to avoid prison and "actually supports rather than undermines his decision to take a plea." Finding plea counsel's testimony credible, the court concluded plea counsel provided competent representation, noting the benefits Yardley received in his plea agreement. The court also determined that Yardley failed to show he was misled or coerced into accepting the plea. Thus, the court denied Yardley's motion to withdraw his plea.

Yardley timely appeals.

*The District Court Did Not Abuse Its Discretion in Denying Yardley's Motion to Withdraw His Plea*

*Standard of Review*

Appellate courts review a district court's denial of a motion to withdraw a guilty or no contest plea for an abuse of discretion. *State v. Shields*, 315 Kan. 131, 139, 504 P.3d 1061 (2022). "The movant bears the burden to prove the district court erred in denying the motion." *State v. Hutto*, 313 Kan. 741, 745, 490 P.3d 43 (2021). The district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on a legal error; or (3) based on a factual error. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023).

"'A district court's factual findings are reviewed for substantial competent evidence. Appellate courts do not reweigh the evidence or assess witness credibility. Instead, appellate courts give deference to the trial court's findings of fact.' [Citations omitted.]" *State v. Johnson*, 307 Kan. 436, 443, 410 P.3d 913 (2018).

*Analysis*

Defendants, such as Yardley, who do not move to withdraw their plea until after their sentence must show "manifest injustice." K.S.A. 22-3210(d)(2). Courts generally consider three factors when considering whether a defendant has established manifest injustice: (1) "whether the defendant was represented by competent counsel"; (2) "whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of"; and (3) "whether the plea was fairly and understandingly made." *Hutto*, 313 Kan. at 745.

Our Supreme Court has outlined the applicable legal standards when a defendant moves to withdraw a plea based on ineffective assistance of counsel:

7

"""When a postsentence motion to withdraw a plea alleges ineffective assistance of counsel, the constitutional test for ineffective assistance must be met to establish manifest injustice." That test asks: "(1) whether the attorney's performance fell below an objective standard of reasonableness and (2) whether there is a reasonable probability that, but for the attorney's errors, the result of the proceeding would have been different." There is a "strong presumption" that counsel provided "'adequate assistance'" and "'made all significant decisions in the exercise of reasonable professional judgment.'" Prejudice means "a reasonable probability that, but for the deficient performance, the defendant would have insisted on going to trial instead of entering the plea." A reasonable probability is a "'probability sufficient to undermine confidence in the outcome.'" [Citations omitted.]'" *Shields*, 315 Kan. at 141.

### 1. *Pursuit of Plea Despite Viable Trial Defense*

Yardley first contends that his plea counsel was deficient by encouraging him to accept the plea offer even though he had a strong defense—expert witness testimony that a child M.Y.'s age could suffer a skull fracture from rolling off a bed, as Yardley contended his son had.

At the plea withdrawal hearing, Yardley testified that he and plea counsel never discussed anything about trial, including possible defenses—a plea was the "sole discussion." Yardley also testified about plea counsel's retention of an expert witness. Before Yardley entered his plea, plea counsel asked him to pay to retain an expert witness and told him there would be an expert report, but he did not specify the reason for retaining an expert. Dr. Terra Frazier wrote the expert report at issue on June 15, 2021— eight months before Yardley entered his plea. In the report, Dr. Frazier concluded a fall from a bed to a hardwood floor was "a plausible mechanism" of M.Y.'s skull fracture and epidural hematoma. But Yardley asserted that he did not see the report until after he was imprisoned, following his probation revocation. Yardley asked about the report "multiple

8

times," but plea counsel told him only that it was "a good report, I'll get it to you when I get it to you."

Ninemire testified that he was "shocked" when Yardley told him about his plea bargain. Ninemire discussed the case with plea counsel and believed that counsel "was intimidated by the circumstantial evidence" and Yardley's criminal history.

Plea counsel testified that he and Yardley discussed trial strategy and Yardley's general defense that he did not harm M.Y. Plea counsel had a "general recollection" of providing "some discovery" to Yardley, though he did not recall specifics. Plea counsel's general practice was to wait for his client to ask for discovery before providing it. He did not know whether Yardley had received Dr. Frazier's report before he went to prison. Plea counsel ultimately agreed that January 6, 2023—the date reflected on the cover letter to Dr. Frazier's report—would have been the day he sent the report to Yardley. But he had turned over Dr. Frazier's report to the State during plea negotiations, identifying the report as "probably the leading factor in getting [Yardley] a favorable plea deal."

When asked whether he thought Yardley had a "good chance" of being acquitted on the child abuse charges, plea counsel stated, "[I]t's not usual that someone has a good chance of winning. But I thought [Yardley] had a very good trial—a case to take to trial, yes."

Plea counsel testified that he had concerns over Yardley's ability to complete probation due to Yardley's bond revocations. He had told Yardley that his record suggested he may not complete probation and had recommended that he consider a shorter prison sentence. Plea counsel understood that the plea Yardley accepted "was the offer he wanted which was to get him out and get him an offer for probation." The parties had previously exchanged other offers, some of which entailed shorter prison sentences, which Yardley "did not want to do."

As noted, the district court found plea counsel's testimony credible and concluded that plea counsel provided competent representation. The court determined that Yardley's "desire to get out of jail immediately is consistent with taking the plea. The plea allows him to stay out of jail forever if he's successful on probation. And that actually supports rather than undermines his decision to take a plea agreement that recommends a departure to probation." The district court also concluded that while Dr. Frazier's report challenged Dr. Heflin's opinion that M.Y.'s injury did not result from an accidental fall, that report was "far from completely undermining one or more elements of the crime."

In ruling on this motion, the district court found guidance in *State v. Green*, 283 Kan. 531, 153 P.3d 1216 (2007). There, Green pleaded no contest to two counts of capital murder, one count of attempted capital murder, and one count of aggravated arson after two of her children were killed in a house fire. When Green was charged, a task force report had concluded that the fire resulted from arson. Green later filed a postsentence motion to withdraw the plea, citing developments in fire investigation that called the task force's report into question. At the plea withdrawal hearing, Green presented expert testimony that the task force's method in concluding that arson had caused the fire was no longer reliable. Green's expert could not identify the exact cause of the fire. The State also called an expert who acknowledged that the task force's methods were incorrect but still concluded the fire had been set intentionally. On appeal, Green claimed her new evidence undermined the factual basis for her plea by creating reasonable doubt.

The Supreme Court found that Green misunderstood the risk-benefit analysis inherent in the plea process:

> "Entry of a plea of guilty or nolo contendere necessarily implies acknowledgment by all concerned—the defendant, the State, and the court—that a jury could go either way and that a risk-benefit analysis has taken place on both sides. The prosecution and the defense have something to gain and something to lose in any plea bargain. They make their peace

10

with the trade-off in exchange for reducing the uncertainty of their situation. Instead of leaving it up to a jury to acquit or convict, to recognize or fail to see any reasonable doubt that may exist, they cut a deal." 283 Kan. at 547-48.

The court also found that Green merely "developed a competing interpretation of old evidence" rather than new evidence. 283 Kan. at 548. Therefore, arson "was not ruled out; it was merely challenged." 283 Kan. at 548. And the State had presented other evidence of Green's guilt in addition to the task force report. Accordingly, the court concluded Green failed to show manifest injustice to withdraw her plea. 283 Kan. at 549.

Yardley does not directly challenge the factual basis for his plea. Instead, he claims plea counsel was ineffective in pursuing a plea when Yardley had a strong defense based on Dr. Frazier's report. But as the district court acknowledged, Yardley does not claim Dr. Frazier's report is new evidence. And Dr. Frazier's report did not "completely undermin[e] one or more elements" of Yardley's charges in 19 CR 2045. Rather, it challenged Dr. Heflin's interpretation of M.Y.'s injuries.

And Dr. Heflin's testimony was not the only evidence that the State could have presented at trial in 19 CR 2045. At the preliminary hearing, J.Z., then Yardley's wife, testified that at the hospital, while M.Y. was still in surgery, Yardley said he wanted a lawyer and "was acting strange." J.Z. also testified that she did not believe Yardley's version of events. J.Z. did not believe M.Y.'s injuries were accidental and thought that Yardley was responsible. J.Z. conveyed that it did not make sense to her that M.Y.'s injury occurred at 10 p.m. but Yardley did not say anything or seek medical attention, then texted J.Z. at midnight about M.Y.'s crying. Therefore, to the extent Yardley claims Dr. Frazier's report definitively undermined the State's case, the district court's conclusion to the contrary is supported by substantial competent evidence. See *Shields*, 315 Kan. at 132.

11

True, plea counsel agreed that he did not send Dr. Frazier's report to Yardley until about three months after Yardley's probation was revoked. That said, plea counsel thought Yardley could have presented a viable defense at trial and testified that he had discussed that defense with Yardley. Plea counsel characterized the plea Yardley accepted as "the offer he wanted which was to get him out and get him an offer for probation." Plea counsel also testified that he had discussed with Yardley his concerns over Yardley's ability to complete probation. Indeed, the record reflects that Yardley's consistent goal throughout the proceedings was to avoid prison. Plea counsel achieved that goal by using Dr. Frazier's report to secure a plea agreement which placed Yardley on probation. Therefore, substantial competent evidence supports the district court's determination that plea counsel performed competently.

Kansas courts have also given credence to plea agreements that secured probation or dismissal of other charges. See *State v. Atteberry*, 44 Kan. App. 2d 478, 497, 239 P.3d 857 (2010) (finding counsel performed effectively where defendant faced possible sentence twice as long as agreed to in plea); *State v. McRae*, No. 108,763, 2014 WL 349567, at *4 (Kan. App. 2014) (unpublished opinion) (finding counsel performed effectively where defendant had long criminal history, faced serious charges, and plea agreement called for probation). Yardley's plea agreement secured these things:

- a recommendation for probation;
- the State's agreement to dismiss multiple counts in 19 CR 2045;
- the State's agreement to recommend that the sentences in 19 CR 2045 and 19 CR 2274 run concurrent to each other;
- the State's agreement to amend count VI in 19 CR 2274 from a severity level 4 offense to severity level 5 offense; and
- the State's agreement to recommend that each count in 19 CR 2274 run concurrently.

12

Accordingly, Yardley received significant benefits both in his sentencing disposition and his underlying sentence length. This is particularly so given that the State had at first filed a notice to seek an upward durational departure in 19 CR 2045. Plea counsel was not deficient in seeking a plea bargain.

### 2. *Coercion by Plea Counsel*

Yardley next asserts that his decision to enter a plea was influenced by "aggressive persuasion" by his counsel when counsel yelled at him that he could go to prison for 45 years. Yardley concedes, however, that at the time of his plea, the district court's plea colloquy satisfied minimal constitutional and statutory standards for accepting a plea knowingly and voluntarily. And at the plea hearing, Yardley told the district court he had not received any promises or threats to accept the plea agreement, and Yardley said the decision to enter the plea was his decision and not someone else's. The district court found that Yardley failed to meet his burden to show that he was misled, coerced, mistreated, or unfairly taken advantage of. We agree.

Yardley's newfound coercion allegation targets a video call with Yardley, his plea counsel, and plea counsel's law partner. The latter allegedly yelled at Yardley and pressured him to accept the plea offer. At that time, Yardley was incarcerated after his bond had been revoked and he was seeking a bond modification to get out of jail. Yardley had never met the law partner before. During the call, the law partner told Yardley that bond modification was unlikely, so they were trying to negotiate a plea deal for his release from jail. Yardley had rejected a plea proposal by plea counsel for 46 months in prison and the State's proposal for 80 months in prison.

According to Yardley, the law partner told Yardley he had "gotten lucky multiple times"—referring to Yardley's releases on bond—and that a plea would be his best option. Yardley claimed the law partner yelled at him, exclaiming: "[Y]ou're not going to

tell me how to practice law, I've been doing law longer than you've been alive" while warning Yardley he "could spend 45 years in prison" if he did not accept a plea. And Ninemire testified that during a meeting with Yardley, Yardley expressed that "he felt like he was pushed into [accepting a plea]."

Plea counsel testified about Yardley's claim that his law partner yelled at Yardley. He recollected that Yardley had disagreed with a legal opinion, to which his law partner made the statements Yardley described. But plea counsel did not think his law partner had "yelled at" Yardley. Still, he stated it was "very common" to have "heated or loud conversations" with "people in situations where they've got two bad choices or two not great choices or they're under a lot of duress." Plea counsel stated he "certainly would have conveyed to [Yardley] how bad it could have gotten if he'd lost," but claimed he did not threaten Yardley. He testified that he told Yardley it was Yardley's decision whether to take the plea.

This evidence constitutes substantial competent evidence supporting the district court's conclusion that Yardley was not misled, coerced, mistreated, or unfairly taken advantage of. See *State v. Schaefer*, 305 Kan. 581, 385 P.3d 918 (2016).

The video call when plea counsel's law partner allegedly yelled at Yardley was the only time Yardley communicated with that law partner. Plea counsel testified that he and Yardley discussed plea negotiations "almost every time" they met. And the record shows that Yardley's primary goal throughout the case was to avoid prison time, a concession he secured by his plea agreement. Thus, even if plea counsel or his law partner may have yelled at or pressured Yardley, he has not shown that he otherwise would not have entered the plea agreement, as is his burden. See *State v. Masood*, No. 101,636, 2009 WL 3378213, at *5 (Kan. App. 2009) (unpublished opinion) (finding even if counsel yelled at defendant during plea negotiations, evidence did not show defendant would have otherwise rejected plea offer and proceeded to trial).

14

### 3. *Decision-making Affected by Mental Health*

Lastly, Yardley asserts that his "extreme anxiety" induced him to accept a plea that was not in his long-term interest.

But as the State contends, the evidence did not show that Yardley suffered from severe mental illness at the time he entered the plea. At that time, the district court asked Yardley if he had "any other issues such as mental health issues that would cause [him] difficulty understanding today's proceeding." Yardley responded unequivocally that he did not. The district court then assured itself that Yardley understood the rights he was giving up and that he had had enough time to discuss his plea with his counsel. After the State explained the details of the plea agreement, Yardley stated he agreed with that description. The district court then asked Yardley whether he understood the potential punishments he faced, and Yardley responded that he did. Yardley also stated that he believed the plea was in his best interest.

Later colloquy shows Yardley's motive for entering his pleas:

"THE COURT: . . . . Mr. Yardley, the attorneys have presented me with a bond form to modify your bond. Now, I just wanted to confirm with you, did you take this plea today because you thought it would be your best chance to get out of jail or did you take the plea because you think it's in your best interest?

"THE DEFENDANT: Both.

"THE COURT: Both?

"All right. And if you didn't have the opportunity to get out of jail today, would you have still tried to take advantage of this plea agreement in the manner that you did?

. . . .

"THE DEFENDANT: I don't know.

. . . .

"THE COURT: What I want to make sure of is that you're not doing something that you don't really want to do. And the only reason that you—you're doing it is to get

15

out of jail today. But you're looking past the long-term consequences of what could happen. If you want to do it because you want to get out of jail, but also you think long-term this plea agreement is in your best interest, that's fine. I understand that that's a factor. For instance, some of the things you might be thinking to yourself are they've amended the top charges down so there's less of a risk on sentencing because they amended a 4 to a 5, for example, they dismissed a few charges, and you want to take advantage of those concessions. Is that consistent with what your thinking is?

"THE DEFENDANT: Yes."

Yardley now claims he signed the plea documents to get out of jail and that accepting the plea was "an impulsive decision" caused by his anxiety. He also claims that he had asked plea counsel to withdraw his plea before sentencing, but plea counsel told him he could withdraw his plea only by filing a K.S.A. 60-1507 motion.

Ninemire testified about his mental health counseling of Yardley. It began about three weeks after Yardley accepted his plea. Ninemire met with Yardley weekly. During the first month-and-a-half of counseling, Ninemire formed multiple mental health diagnoses of Yardley. He testified that Yardley had extreme anxiety, post-traumatic stress disorder, social anxiety, and panic disorder with agoraphobia. Ninemire believed Yardley's mental health conditions began in early childhood and that they "likely existed" at the time Yardley entered his plea. In Ninemire's view, Yardley's decision to enter his plea "could have been greatly compromised" by his mental health condition.

When plea counsel was asked if he had ever detected mental health issues from Yardley that caused him concern, he responded that he had observed "no more than anybody else that I deal with that's in a lot of trouble or looking at a lot of trouble." Plea counsel denied having told Yardley he would have to file a K.S.A. 60-1507 motion to withdraw his plea. Rather, he had told Yardley if he wanted to withdraw his plea, "he would have to hire new counsel, file a motion for whatever basis he's alleging that I ineffectively did, I couldn't file that on myself."

16

The district court found that Yardley understood the plea agreement when he entered his plea. The court pointed to its extensive exchange with Yardley during the plea hearing, the discussion of the plea agreement details at the plea hearing, the case filings, and Yardley's history of being in court for "substance abuse and violence problems." The district court further found that Yardley fairly and understandably entered his plea.

We find it significant that the district court presided over both the plea hearing and the plea withdrawal hearing. At Yardley's plea hearing, the district court engaged in extensive questioning to ensure Yardley understood his plea. At that hearing, Yardley stated his decision-making was not compromised by mental health issues and that he believed his plea was in his best interest. After the district court followed up with Yardley on whether he was entering his plea because it was in his best interest or because he simply wanted to get out of jail, Yardley confirmed that he believed it was in his best interest. The district court could best compare Yardley's plea hearing statements with his and Ninemire's testimony at the plea withdrawal hearing.

The district court had the chance to observe Yardley both at his plea hearing and his plea withdrawal hearing and could judge his sincerity between the two. The district court's determination that Yardley understood his plea was supported by substantial competent evidence. See *Schaefer*, 305 Kan. at 595-96 (rejecting claim that defendant was not in the right frame of mind when he entered his pleas due to side effects from his medications for a traumatic brain injury); *State v. Atlas*, No. 111,825, 2015 WL 4879114, at *4-5 (Kan. App. 2015) (unpublished opinion) (rejecting claim based in part on psychiatrist's testimony that defendant could not have made informed plea based on his degree of anxiety and sedation from Xanax because court credited another psychiatrist who disagreed and plea counsel who had no concerns about defendant's competency).

The district court found plea counsel credible and concluded that Yardley fairly and understandably entered his plea. We find substantial competent evidence,

17

summarized above, supporting the district court's conclusion that Yardley's mental condition did not vitiate his voluntary plea.

We thus affirm the district court's denial of Yardley's motion to withdraw his plea.

Affirmed.